COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                 FORT
WORTH

 

 

                                        NO.
2-06-244-CV

 

 

GAMAL ABDEL-HAFIZ                                                          APPELLANT

 

                                                   V.

 

ABC, INC., ABC NEWS, INC.,                                                 APPELLEES

ABC
NEWS HOLDING COMPANY, INC.,

CHARLES
GIBSON, BRIAN ROSS,

ROBERT
WRIGHT, AND 

JOHN
VINCENT

 

                                              ------------

 

            FROM
THE 67TH DISTRICT COURT OF TARRANT COUNTY

 

                                              ------------

 

                                             OPINION

 

                                              ------------

On the court=s own motion, we withdraw the opinion and judgment dated August 31,
2007 and substitute the following.








In two issues, appellant
Gamal Abdel‑Hafiz appeals the trial court=s orders granting summary judgment in favor of appellee ABC[1]
and dismissing appellees Robert Wright and John Vincent for want of
jurisdiction.  We affirm.

                                          BACKGROUND

Appellant, born and educated
in Egypt, came to the United States (AU.S.@) to work in
1984 and became a U.S. citizen in March 1990. 
He became a language specialist with the Federal Bureau of Investigation
(AFBI@) in January
1994 and then a special agent in the Dallas FBI office.  He was assigned to the Dallas FBI office=s international terrorism unit from 1996 to 2001 and served as
assistant legal attache to the U.S. Embassy in Saudi Arabia from 2001 to
2003.  He was recalled from Saudi Arabia
by the FBI in February 2003 for an administrative inquiry into insurance fraud
allegations made by his ex‑wife. 
This investigation led to his termination; the FBI later reinstated him.








The alleged defamation
involves statements made by Wright and Vincent of the FBI=s terrorist unit in Chicago and assistant U.S. attorney Mark Flessner,
also based in Chicago, about Appellant=s reaction to a request that he consensually monitor, that is, wear a
wire while interviewing, a Muslim suspect in a 1999 FBI investigation, and by
FBI agent Barry Carmody, of the FBI=s terrorism unit in Tampa, with regard to a similar request in
1998.  Wright and Vincent gave taped
interviews on December 9, 2002 for ABC=s nationally televised Primetime Thursday broadcast (ABroadcast@) and a
related internet article (AArticle@).  Carmody and Flessner also gave taped
interviews to ABC. ABC published the Broadcast and the Article on December 19,
2002.  Appellant specifically complains
of the following statements (AChallenged Statements@) on appeal.[2]

Challenged Broadcast Statements

Broadcast
Statement One:  Charles
Gibson: ASee
if this gets your attention.@  AOr how about this?  A Muslim FBI agent accused of refusing orders
to secretly record another Muslim suspected of terrorist connections.@

 








Broadcast
Statement Two:  Wright: ASeptember
11th is a direct result of the incompetence of the FBI=s
International Terrorism Unit.  No doubt
about that.  Absolutely no doubt about
that.@  Brian Ross: APerhaps
most astounding of the many mistakes, according to Flessner and affidavits
filed by Agent Wright, is how another FBI Agent who is Muslim seriously damaged
the investigation, telling Wright and Vincent he would refuse to secretly
record one of Kadi=s
suspected associates who was also Muslim.@[[3]]

 

Broadcast
Statement Three: Wright: AA Muslim doesn=t
record another Muslim.@

 

Broadcast
Statement Four: Brian Ross: AFar from being reprimanded,
the FBI promoted the Muslim agent to one of its most important anti‑terrorism
posts at the American Embassy in Saudi Arabia, handling sensitive investigations
for the FBI in the Muslim country.@

 

With regard to the Challenged Statements in the
Article, Appellant merely states that the Article Acontains many of the same statements as the Primetime Thursday
Broadcast, but also provides Appellant=s name.@  Therefore, we will only consider the Article
statements that Appellant complained of in his first amended and supplemental
petitions and that are duplicated in the Broadcast.

Challenged
Article Statements

 

Article
Statement One: A. . . FBI Agent
named Gamal Abdel‑Hafiz seriously damaged the investigation.@

 

Article
Statement Two: AWright says Abdel‑Hafiz,
who is Muslim, refused to secretly record one of Al‑Kadi=s
suspected associates, who was also Muslim. 
Wright says Abdel‑Hafiz told him, Vincent, and other agents that >a
Muslim doesn=t
record another Muslim.=@ 

 








Article
Statement Three: A. . . Abdel‑Hafiz
told him, Vincent and other agents that >a Muslim doesn=t
record another Muslim.=@[[4]]

 

Appellant also listed the
following phrases in his supplemental petition and addresses them on appeal: A. . . allegations that a Muslim FBI agent may have thwarted
the investigation two years before . . . September 11, 2001,@ and AGamal Abdel‑Hafiz,
a Muslim FBI Agent, refused to cooperate with an FBI probe into BMI, Inc.,
. . . .@  These phrases are from ABC=s November 26, 2002 article entitled, ADirty Dozen: The FBI May Have Dragged Its Feet on Investigating the
Saudi Money Trail@ (ANovember Article@).  ABC addressed the November Article in its
motion for summary judgment, arguing that Appellant=s claims on these phrases were barred by the one‑year statute of
limitations because Appellant filed his lawsuit on December 17, 2003.  Appellant also addresses, with regard to the
issue of actual malice, ABC=s selection of material and its Adecision to juxtapose@ allegations involving him with a photo and voice over regarding the
September 11, 2001 (A9/11")
terrorist attacks.








Appellant sued ABC, Disney Enterprises,
Inc., WFAA‑TV, L.P., WFAA of Texas, Inc., Belo Corp., Charles Gibson,
Brian Ross, Wright, and Vincent for libel per se, slander per se, libel per
quod, slander per quod, statutory libel, libel and slander by innuendo and
implication, and the omission of material facts and juxtaposition of facts in a
material way such that the gist of the Broadcast and the Article was false.[5]  Brian Ross is the ABC News chief
investigative correspondent responsible for the Broadcast, and co-author of the
Article. Charles Gibson is the ABC news anchor who read the Broadcast
introduction. Appellant sought $3.5 million in compensatory damages plus
exemplary damages.[6]








The trial court granted
Disney Enterprises, Inc.=s special
appearance and dismissed the claims against Belo Corp., WFAA‑TV, L.P.,
and WFAA of Texas, Inc.  Wright, an
Indiana resident, and Vincent, an Illinois resident, also specially
appeared.  After a hearing, the trial court
dismissed Appellant=s claims
against Wright and Vincent for want of jurisdiction.  The trial court sustained many of ABC=s objections to Appellant=s summary judgment evidence, which Appellant does not appeal, and
granted summary judgment for ABC after a hearing.

                                    SPECIAL APPEARANCE

In his second issue,
Appellant complains that the trial court erred by granting Wright and Vincent=s special appearances, claiming that their affidavits did not support
their special appearances and that personal jurisdiction was appropriate in
Texas because Athe
allegedly libelous statements concerned the Texas activities of a Texas FBI
agent, and the brunt of the harm was to Appellant in Texas.@








Appellant sued Wright and
Vincent for defamation pertaining to their statements in the ABC interview,
Wright=s statements made at a May 2002 Judicial Watch press conference in
Washington and in a November 2002 Wall Street Journal article,[7]
and Vincent=s statements
made in interviews with PBS Frontline in March 2000 and CBS 11 in Dallas
and the Dallas Morning News in March 2003.  On appeal, Appellant addresses personal
jurisdiction only with regard to the statements from the ABC interview.  Therefore, we will address the trial court=s orders on Wright and Vincent=s special appearances only with regard to the ABC interview.[8]  See Tex.
R. App. P. 38.1(e), 47.1.

Standard Of Review








The trial court=s orders sustaining Wright and Vincent=s objections to jurisdiction stated that, Ahaving considered the pleadings, evidence, and arguments of counsel,@ it did not have personal jurisdiction over them.  Whether a trial court has personal
jurisdiction over a defendant is a question of law reviewed de novo.  BMC Software Belg., N.V. v. Marchand,
83 S.W.3d 789, 793-94 (Tex. 2002); TravelJungle v. Am. Airlines, Inc.,
212 S.W.3d 841, 845 (Tex. App.CFort Worth 2006, no pet.); SITQ, E.U., Inc. v. Reata, 111
S.W.3d 638, 644 (Tex. App.CFort Worth 2003, pet. denied). 
The plaintiff bears the initial burden of pleading sufficient
allegations to bring a nonresident defendant within the provisions of the Texas
long‑arm statute.  BMC Software,
83 S.W.3d at 793; TravelJungle, 212 S.W.3d at 845; Reata, 111
S.W.3d at 644.  Here, Appellant met his
initial burden by asserting that Wright and Vincent had constitutionally
sufficient minimum contacts related to his defamation claims under section
17.042 of the civil practice and remedies code, because the claims arose Aout of torts committed in whole or in part in [Texas].@  See Tex. Civ. Prac. & Rem. Code Ann. ' 17.042 (Vernon 1997). 
Appellant contended to the trial court that the ABC interview was Adirected to viewers in Texas, as that is where [Appellant] was
employed and where [Appellees] knew that [Appellant=s] co‑workers would see and read the false, libelous, and
defamatory statements.@  He asserted that Wright and Vincent Aknew their comments to the media were false, defamatory, and libelous
and directed to cause damage to [Appellant] and his professional reputation in
Texas@ and that their conduct was specifically directed to injure and harm
him where A[his]
permanent residence has been at all relevant times.@

A nonresident defendant
challenging a Texas court=s personal
jurisdiction over it must negate all jurisdictional bases.  BMC Software, 83 S.W.3d at 793; TravelJungle,
212 S.W.3d at 845; Reata, 111 S.W.3d at 644.  We review all of the evidence in making this
determination.  TravelJungle, 212
S.W.3d at 845; Reata, 111 S.W.3d at 645; Michel v. Rocket Eng=g Corp., 45 S.W.3d 658, 667 (Tex.
App.CFort Worth 2001, no pet.).

Personal Jurisdiction








Texas courts may exercise
jurisdiction over a nonresident defendant only if the exercise of jurisdiction
is authorized by the Texas long‑arm statute and comports with state and
federal constitutional guarantees of due process.  Moki Mac River Expeditions v. Drugg,
221 S.W.3d 569, 574 (Tex. 2007); BMC Software, 83 S.W.3d at 795; see
also Tex. Civ. Prac. & Rem. Code
Ann. ' 17.042(2)
(defining Adoing
business@ under long‑arm statute as committing a tort in the state).  The long‑arm statute=s broad Adoing‑business@ language allows the statute to Areach as far as the federal constitutional requirements of due process
will allow.@  Moki Mac, 221 S.W.3d at 575.

The federal due process test
consists of two parts: (1) whether the nonresident defendant purposely
established Aminimum
contacts@ in the forum state; and (2) if so, whether the exercise of personal
jurisdiction comports with Afair play and substantial justice.@  Burger King Corp. v.
Rudzewicz, 471 U.S. 462, 475‑76, 105 S. Ct. 2174, 2183‑84
(1985); Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.,
815 S.W.2d 223, 230‑31 (Tex. 1991). 
Minimum contacts are sufficient for personal jurisdiction when the
nonresident defendant purposefully avails itself of the privilege of conducting
activities within the forum state, thus invoking the benefits and protections
of its laws.  See Hanson v. Denckla,
357 U.S. 235, 253, 78 S. Ct. 1228, 1240 (1958); Michiana Easy Livin= Country, Inc. v. Holten, 168 S.W.3d
777, 784 (Tex. 2005).








A nonresident=s contacts with the forum state may give rise to either specific or
general jurisdiction.  BMC Software,
83 S.W.3d at 795‑96.  Specific
jurisdiction exists where the defendant=s alleged liability stems from an activity conducted within the forum
state.  Id. at 796.  General jurisdiction exists where the
defendant made continuous and systematic contacts with the forum state.  Id. 
None of the evidence presented to the trial court supported a contention
that Wright and Vincent had the continuous and systematic contacts with Texas
required for the exercise of general jurisdiction.








A Texas court may assert
specific jurisdiction over an out‑of‑state defendant if the
defendant=s contact
with this state is purposeful and the injury arises from or relates to those
contacts.  See Moki Mac, 221
S.W.3d at 572‑73, 576 (considering, in light of Michiana, the
extent to which a claim must Aarise from or relate to@ forum contacts to confer specific jurisdiction over a nonresident
defendant in a wrongful‑death case against an out‑of‑state
rafting outfitter).  This Apurposeful availment@ inquiry has three parts: (1) only the defendant=s contacts with the forum are relevant, not the unilateral activity of
another party or a third person; (2) the contacts relied upon must be
purposeful rather than random, fortuitous, or attenuated; and (3) the defendant
must seek some benefit, advantage, or profit by Aavailing@ itself of
the jurisdiction.  Id. at 575; Michiana,
168 S.W.3d at 784‑85; see also Rudzewicz, 471 U.S. at 476 n.18,
105 S. Ct. at 2184 n.18; World‑Wide Volkswagen Corp. v. Woodson,
444 U.S. 286, 297, 100 S. Ct. 559, 567 (1980); Fielding v. Hubert Burda
Media, Inc., 415 F.3d 419, 425 (5th Cir. 2005) (stating that specific
jurisdiction in suits alleging an intentional tort based on the publication of
defamatory material exists for (1) publication with adequate circulation in the
forum state, per Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 104 S.
Ct. 1473 (1984), or (2) an author or publisher who Aaims@ a story at
the state knowing that the Aeffects@ of the
story will be felt there, per Calder v. Jones, 465 U.S. 783, 104 S. Ct.
1482 (1984)).  Appellant asserts that
personal jurisdiction over Wright and Vincent is appropriate under Calder.  See Calder, 465 U.S. at 788-89, 104 S.
Ct. at 1486-87.








When specific jurisdiction is
alleged, we focus on the relationship among the defendant, the forum, and the
litigation.  See Moki Mac, 221
S.W.3d at 575‑76.  For a
nonresident defendant=s forum
contacts to support an exercise of specific jurisdiction, there must be both
purposeful contact with Texas and a substantial connection between those
contacts and the operative facts of the litigation.  See id. at 579, 585 (holding that
nonresident defendant did have sufficient purposeful contact with Texas but
that there was no substantial connection to support the exercise of specific
jurisdiction between those contacts, that is, between the rafting company=s advertising and the plaintiff=s wrongful death claim); Michiana, 168 S.W.3d at 781-92
(stating that there was no purposeful contact because nonresident defendant=s sale in Texas resulted from the Amere fortuity@ that the
plaintiff happened to reside here and not from any affirmative efforts by the
defendant to solicit business in Texas).

Wright and Vincent made the
same arguments in their special appearance motions, contending, among other
arguments, that they never identified Appellant or committed a tort in Texas;
that they had no minimum contacts with Texas; that they could not reasonably
have foreseen being haled into a Texas court in this matter; and that the
alleged cause of action did not arise from any conduct by Wright or Vincent
directed at Texas.  The trial court
sustained Wright and Vincent=s objections to Appellant=s affidavit.[9]  Appellant does not appeal the trial court=s ruling.








Wright and Vincent also
asserted that the Texas Supreme Court in Michiana had expressly
disapproved of the Adirected a
tort@ type jurisdiction relied on by Appellant.  See 168 S.W.3d at 790‑92.  They attached evidence pertaining to
Appellant=s sale of
his Texas home after his relocation to Saudi Arabia in 2001 and claimed that
there was a lack of evidence to show that they knew that Appellant Aresided@ in Texas
during that time.  They also attached
Appellant=s answers to
their interrogatories, portions of Appellant=s deposition, and the FBI Initial Written Agreement on Appellant=s overseas assignment.  At the
hearing, at Appellant=s request,
the trial court admitted the ABC interview, portions of Wright=s and Vincent=s
depositions in which they stated that Appellant was the AMuslim agent@ referred to
in the ABC interview, and two FBI memoranda establishing that Wright and
Vincent knew Appellant was stationed in the Dallas FBI office in 1999.








It is uncontested that
neither Wright nor Vincent were Texas residents and that the ABC interview in
2002 took place in Illinois.[10]  Appellant=s evidence at the hearing established that Wright and Vincent were aware
that Appellant was assigned to the Dallas FBI office in 1999.  Vincent testified that ABC informed them that
Appellant was in Riyadh, Saudi Arabia, Ajust prior to our interview in December of 2002" and that he had
no idea that Appellant might subsequently be recalled to Dallas.[11]  Wright testified that he understood that ABC Primetime
was broadcast nationally.[12]








A review of the ABC interview
shows that its focus was on the FBI and its activities and problems with regard
to terrorism, including Wright and Vincent=s backgrounds with the FBI and problems they had with the Aupper echelons of [FBI] management.@  Wright discussed the AMuslim FBI agent@ in Dallas
in April 1999 as an example of the problems within the FBI.[13]  That portion of the interview described what
was said during the conference call about the consensual monitoring, Wright and
Vincent=s reactions, that there had been other problems with the agent with
the Washington and Tampa FBI offices, and that the agent filed a discrimination
complaint against Wright.  Wright also
discussed the five-hundred page book he wrote prior to the 9/11 attacks about
what the FBI could have done to neutralize terrorists.













Focusing our analysis first
on the relationship among the defendants, the forum, and the litigation, the
record does not disclose any purposeful contact or connection between Wright
and Vincent to Texas, other than that the Dallas FBI office was where Appellant
was stationed in 1999 when they sought to have him consensually monitor a
Muslim suspect.  The record reflects that
Wright believed the broadcast would be nationwide, that Vincent did not believe
Appellant was in Dallas when he gave the interview, and that the AMuslim agent@ discussion
was within the context of problems within the FBI with regard to terrorism
investigations.  See Moki Mac, 221
S.W.3d at 575‑76; see also Fielding, 415 F.3d at 425-26 (stating
that Calder jurisdiction requires a case‑by‑case analysis of
the publication=s purpose
and impact and that, in addition to requiring that the story=s Aeffects@ be felt in the forum, the defendant=s Aaim@ must be demonstrated by showing that the article=s subject matter, and the sources relied upon for the article, were in
the forum state).  Wright and Vincent
made the allegedly defamatory statements in the ABC interview in Illinois based
upon their personal experiences and the statements were then broadcast
nationally.  There is no evidence in the
record to support Appellant=s contention that Wright and Vincent directed their statements
specifically at Texas or that they did not believe ABC=s information that Appellant was in Saudi Arabia.  Therefore, we conclude that the trial court
correctly determined that it had no personal jurisdiction over Wright and
Vincent because there was no purposeful contact with Texas after 1999 by Wright
and Vincent to support even an attenuated connection with Appellant=s defamation claims pertaining to the 2002 ABC interview.  See Moki Mac, 221 S.W.3d at 579, 585; Michiana,
168 S.W.3d at 791‑92; Fielding, 415 F.3d at 425‑26; cf.
Calder, 465 U.S. at 785, 788-90, 104 S. Ct. at 1484, 1486-87 (stating that
the defamation plaintiff, a California resident and television actress, was the
focus of the activities of the Florida defendants in intentionally writing and
editing their National Enquirer article in which they alleged that she
drank so heavily as to prevent her from fulfilling her professional
obligations, and that the defendants expressly aimed their actions at
California, where they knew their article Awould have a potentially devastating impact@ on her and where she would bear the brunt of that injury because she
lived and worked there and the newspaper had its largest circulation in that
state).  We overrule Appellant=s second issue.

                                    SUMMARY JUDGMENT








In his first issue, Appellant
contends that the trial court erred by granting summary judgment in favor of
ABC.  Specifically, Appellant argues that
there are genuine issues of material fact as to whether the Broadcast and the
Article were true (subissue 1) and as to actual malice (subissue 2), that the
Broadcast and the Article were not Aopinion, rhetoric, or hyperbole@ (subissue 3), that his claims regarding the November Article are not
barred by limitations (subissue 4), that the AState Secrets Privilege@ does not prevent ABC from presenting its case (subissue 5), and that
he brought forth adequate evidence to defeat the no-evidence motion (subissue
6).  Because they are dispositive, we
first address Appellant=s second and
sixth subissuesCdid
Appellant raise more than a scintilla of probative evidence of actual malice by
ABC?

Standard Of
Review








After an adequate time for
discovery, the party without the burden of proof may, without presenting
evidence, move for summary judgment on the ground that there is no evidence to
support an essential element of the nonmovant=s claim or defense.  Tex. R. Civ. P. 166a(i).  The motion must specifically state the
elements for which there is no evidence. 
Id.; Johnson v. Brewer & Pritchard, P.C., 73 S.W.3d
193, 207 (Tex. 2002).  When reviewing a
no‑evidence summary judgment, we examine the entire record in the light
most favorable to the nonmovant, indulging every reasonable inference and
resolving any doubts against the movant. 
Sudan v. Sudan, 199 S.W.3d 291, 292 (Tex. 2006).  The trial court must grant the motion unless
the nonmovant produces summary judgment evidence that raises a genuine issue of
material fact.  See Tex. R. Civ. P. 166a(i) & cmt.; Sw.
Elec. Power Co., 73 S.W.3d at 215. 
If the nonmovant brings forward more than a scintilla of probative
evidence that raises a genuine issue of material fact, then a no evidence
summary judgment is not proper.  Moore
v. K Mart Corp., 981 S.W.2d 266, 269 (Tex. App.CSan Antonio 1998, pet. denied). 
ALess than a scintilla@ exists when the evidence is so weak as to do no more than create a
mere surmise or suspicion of a fact.  King
Ranch v. Chapman, 118 S.W.3d 742, 751 (Tex. 2003), cert. denied, 541
U.S. 1030 (2004).  AMore than a scintilla@ exists when the evidence would enable reasonable and fair‑minded
people to reach different conclusions.  Ford
Motor Co. v. Ridgway, 135 S.W.3d 598, 601 (Tex. 2004); Merrell Dow
Pharm., Inc. v. Havner, 953 S.W.2d 706, 711 (Tex. 1997).  A genuine issue of material fact is raised by
presenting evidence on which a reasonable jury could return a verdict in the
nonmovant=s
favor.  Moore, 981 S.W.2d at 266; see
also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255‑56, 106 S.
Ct. 2505, 2513‑14 (1986) (interpreting Fed.
R. Civ. P. 56).

Texas Rule of Civil Procedure
166a does not prohibit a party from combining in a single motion a request for
traditional summary judgment and a request for no‑evidence summary
judgment.  See Tex. R. Civ. P. 166a(c), (i); Binur
v. Jacobo, 135 S.W.3d 646, 650 (Tex. 2004). 
When, as here, a party moves for summary judgment under both rules
166a(c) and 166a(i), we will first review the trial court=s judgment under the no‑evidence standards of rule 166a(i).  Ford Motor Co., 135 S.W.3d at
600.  If the non‑movant failed to
produce more than a scintilla of evidence under that burden, then there is no
need to analyze whether the movant=s summary judgment proof satisfied the traditional summary judgment
test of rule 166a(c).  Id.

Defamation








Appellant sued ABC under
various defamation theories.  To maintain
any of his defamation claims, Appellant had the burden to prove that ABC: (1)
published a statement; (2) that was defamatory concerning Appellant; (3) while
acting with either actual malice, if Appellant was a public official or public
figure, or negligence, if he was a private individual, regarding the statement=s truth.  WFAA‑TV, Inc.
v. McLemore, 978 S.W.2d 568, 571 (Tex. 1998), cert. denied, 526 U.S.
1051 (1999).  Neither party disputes that
ABC published Broadcast Statements One through Four and Article Statements One
through Three; ABC did contest publication of the two November Article phrases
but admitted in its limitations argument that it published them on November 26,
2002 on its website.  Based on the
parties= summary judgment pleadings presented to the trial court, we confine
our review here to the Aactual
malice@ standard.[14]

Constitutional AActual Malice@








A no-evidence summary
judgment would be improper only if we conclude, after examining the entire
record, that Appellant has presented evidence creating more than a surmise or
suspicion that ABC published the statements with actual malice.[15]  See Sudan, 199 S.W.3d at 292; King
Ranch, 118 S.W.3d at 751. 








AActual
malice@ in the defamation sense does not include ill will, spite, or evil
motive.  Casso v. Brand, 776
S.W.2d 551, 558 (Tex. 1989).  Rather, to
establish actual malice, the plaintiff must prove that the defendant published
a defamatory falsehood Awith
knowledge that it was false or with reckless disregard of whether it was false
or not.@  WFAA‑TV, 978
S.W.2d at 571 (quoting New York Times Co. v. Sullivan, 376 U.S. 254, 279‑80,
84 S. Ct. 710, 726 (1964)).  The actual
malice standard=s purpose is
to protect innocent but erroneous speech on public issues, while deterring Acalculated falsehoods.@  Turner, 38 S.W.3d at
120 (citing Garrison v. Louisiana, 379 U.S. 64, 75, 85 S. Ct. 209, 216
(1964)); see also New York Times, 376 U.S. at 270, 84 S. Ct. at 721
(stating that defamation cases must be considered Aagainst the background of a profound national commitment to the
principle that debate on public issues should be uninhibited, robust, and wide‑open,
and that it may well include vehement, caustic, and sometimes unpleasantly
sharp attacks on government and public officials@).  To prevail at trial, a
public figure plaintiff must establish actual malice by clear and convincing
evidence, but the Texas Supreme Court has declined to adopt the clear‑and‑convincing
standard at the summary judgment stage.  Huckabee
v. Time Warner Entm=t Co., 19 S.W.3d 413, 420-21 (Tex.
2000).








The meaning of terms such as Aactual malice@Cand, more particularly, Areckless disregard@Cis not readily captured in one infallible definition.  St. Amant v. Thompson, 390 U.S. 727,
730, 88 S. Ct. 1323, 1325 (1968).  And
while knowledge of falsity is a relatively clear standard, reckless disregard
is much less so.  See, e.g., Bentley,
94 S.W.3d at 591 (reviewing U.S. Supreme Court cases on actual malice).  Reckless disregard is a subjective standard
that requires the plaintiff to bring forth evidence that the defendant
entertained serious doubts as to the truth of the publication at the time it
was published.  Hearst Corp. v. Skeen,
159 S.W.3d 633, 637 (Tex. 2005); see also Harte‑Hanks Commuc=ns, Inc. v. Connaughton, 491 U.S.
657, 688, 109 S. Ct. 2678, 2696 (1989) (stating that reckless disregard
involves a Ahigh degree
of awareness of probable falsity@); St. Amant, 390 U.S. at 731, 88 S. Ct. at 1325 (stating that
there must be sufficient evidence to permit the conclusion that the defendant
in fact entertained serious doubts as to the truth of his publication).  And a publisher=s presentation of facts may be misleading, even negligently so, but
will not constitute a Acalculated
falsehood@ unless the
publisher knows or strongly suspects that it is misleading.  Turner, 38 S.W.3d at 120.








Actual malice focuses on the
defendant=s state of
mind, particularly his attitude toward the truth of what he reported, which a
plaintiff can prove through objective evidence about the publication=s circumstances and the defendant=s conduct at the time of publication. 
Id.; WFAA‑TV, Inc., 978 S.W.2d at 573; see also
Bentley, 94 S.W.3d at 591, 596 (stating that defendant=s lack of care and motive are factors to consider).  When the defendant=s words lend themselves to more than one interpretation, the plaintiff
must establish that the defendant either knew that the words would convey a
defamatory message or had reckless disregard for their effect.  New Times, Inc. v. Isaacks, 146 S.W.3d
144, 162 (Tex. 2004), cert. denied, 545 U.S. 1105 (2005).  Publications alleged to be defamatory must be
viewed as a wholeCincluding
accompanying statements, headlines, pictures, and the general tenor and
reputation of the source itself, and we consider the actual malice issue within
this context.  See City of Keller v.
Wilson, 168 S.W.3d 802, 811 (Tex. 2005) (citing New Times, Inc., 146
S.W.3d at 158‑59, for the proposition, with regard to a no‑evidence
assertion, that legal sufficiency cannot disregard parts of a publication,
considering only false statements to support a plaintiff=s verdict or only true ones to support a defense verdict).

Broadcast And
Article

We have reviewed the
Broadcast and the Article and include them here, bolding the portions that
contain the alleged defamatory statements. 
Gibson provided the introductory narration, known as a Avoice over,@ for Ross= story, AThe Story
the FBI Didn=t Want Told.@  AVoice over@ is
shortened to A(VO)@ in the transcript of the Broadcast and Aon camera@ is shorted
to A(OC).@

Broadcast

Gibson:      (VO) The story the
FBI did not want told.

Wright:      You can=t know the things I know and not go public.

Gibson:      (VO) Why were these FBI agents called off
the trail of a rich Saudi businessman, suspected of helping to bankroll Osama
bin Laden.  But wait, it could get
worse.  The Saudi may own a computer
company that creates sensitive software for the FBI itself.

 

Wright:      September 11th is a direct result of the
incompetence of the FBI=s
International Terrorism Unit.  No doubt
about that.








Gibson:      (VO) Tonight, Brian Ross with a major APrimetime@
investigation.

 

                                                  .
. .

 

Announcer: Next, explosive allegations.  Two FBI Agents step out of the shadows to
tell what they know.  In the months
before September 11th, why were they stopped from pursuing suspected terrorist
cells in the Chicago area and told to let sleeping dogs lie?

 

Wright:      Those dogs weren=t
sleeping.  They were training, they were
getting ready.    . . .

 

Gibson:      (OC) See if this gets your attention.  A rich, Saudi businessman, suspected of
funneling money to Osama Bin Laden, who is also a suspected owner of a company
that creates highly sensitive software for the FBI.  Or how about this, a Muslim FBI Agent
accused of refusing orders to secretly record another Muslim suspected of
terrorist connections.  [Broadcast
Statement One]  Well tonight, two FBI
Agents come forward to say if all of that worries you, it should.  They put everything at risk to give Chief
Investigative Correspondent Brian Ross a disturbing account that the FBI has
tried to keep secret.

 

Ross: (VO) 10:00 last Monday morning in Chicago.  This was the day.  This was the hour.  This was the interview FBI headquarters in
Washington feared was coming.  Two of the
FBI=s own,
Special Agents Robert Wright and John Vincent breaking ranks.

 

Wright:      You can=t know the things I know and
not go public.

 

Ross: (VO) Finally telling the story they say the FBI
has tried to keep secret from Congress and the American public.

 

Wright:      September 11th is a direct result of
the incompetence of the FBI=s International Terrorism
Unit.  No doubt about that.  Absolutely no doubt about that.
[Part of Broadcast Statement Two]

 

Ross: (OC) You=re an FBI agent and you=re
saying that about the FBI?

 








Wright:      I know that.  Yes.

 

Ross: (VO) It=s a long way from the day 12
years ago when, as a law school graduate from Indiana, Robert Wright took the
oath to become an agent of the FBI.

 

Wright:      To protect America from all enemies,
foreign and domestic.

 

Ross: (OC) And you think you tried to do that?

 

Wright:      Others tried to stop me but I tried to do
that.

 

Ross: (VO) Wright=s partner, John Vincent,
joined the FBI 27 years ago.  A young
lawyer from South Dakota who would become one of the Bureau=s
most seasoned street agents before retiring a few days after this interview.

 

Vincent:     Truthfully, if 9/11 had not occurred we
wouldn=t be
here.

 

Ross: (OC) Really?

 

Vincent:     Because of 9/11, we=re
here.  Because we see the danger.

 

Ross: (VO) Their story begins in the mid-1990s.  With growing terrorism in the Middle East,
the two agents were assigned to track a connection to Chicago, a suspected terrorist
cell that would later lead them to an Osama Bin Laden connection.

 

[While
Ross narrates, stock footage of results of a terrorist attack shows injured
persons and resulting chaos.]

 

Wright:      We had a cell in Chicago, right.  And that was, that was the premise of how we
got the investigation going.

 

Ross: (VO) But Wright says he soon discovered that
all the FBI Intelligence Division wanted him to do was to follow suspected
terrorists around town and file reports, but make no arrests.

 








Wright:      The supervisor who was there from
headquarters was right straight across from me and started yelling at me, A[Y]ou
will not open criminal investigations.  I
forbid any of you.  You will not open
criminal investigations against any of these intelligence suspects.@

 

Ross: (OC) You=re on the Terrorism Task
Force and you were told you will not open criminal cases?

 

Wright:      Yes.

 

Ross: (VO) In 1998, Al-Qaeda terrorists bombed two
American Embassies in Africa, killing more than 200 people.  The agents say some of the money for the
attack led back to the people they had been tracking in Chicago, and to a powerful
Saudi Arabian businessman, this man, Yassin Kadi, who had extensive business
and financial ties in Chicago.  Yet, even
after the bombings, the agents say headquarters ordered no arrests.

 

[While
Ross narrates, a stock clip of the 1998 U.S. Embassy bombings, showing bodies
and wreckage plays, followed by a photograph of Kadi.]

 

Wright:      Two months after the embassies are hit in
Africa, they want to shut down the criminal investigation.  They wanted to kill it.

 

Ross: (VO) The move outraged the Federal Prosecutor
in Chicago, who says Agents Wright and Vincent were helping him build a strong
criminal case against Kadi and others.

 

[While
Ross narrates this portion, what appears to be a federal building is shown,
with an American flag waving outside in the breeze.]

 

Flessner:     There were powers bigger than I was in the
Justice Department and within the FBI that simply were not going to let it
happen.  And it didn=t
happen.

 

Ross: Mark Flessner, now in private practice, says he
still can=t
figure out why Washington stopped the case, whether it was Saudi influence or
bureaucratic ineptness.

 








Flessner:     I think there were very serious mistakes
made.  And I think it, perhaps, cost, it
cost people their lives, ultimately.  

 

Ross: (VO) Perhaps the most astounding of the many
mistakes, according to Flessner and affidavits filed by agent Wright is how
another FBI agent who is Muslim seriously damaged the investigation.  Telling Wright and Vincent, he would refuse
to secretly record one of Kadi=s suspected associates who
was also Muslim. [Remainder of Broadcast Statement Two]

 

[While
Ross narrates, a close-up of Wright=s redacted EEOC statement is
shown.]

 

Wright:      A Muslim doesn=t
record another Muslim.  [Broadcast
Statement Three] Right out of his own mouth.  Five of us, six of us heard it.

 

Vincent:     He wouldn=t
have any problems interviewing or recording somebody who wasn=t a
Muslim but he could never record another Muslim.

 

Ross: (OC) What do you make of that?  Thinking back to the oath you took as an FBI
Agent?

 

Wright:      I was floored.  I went back upstairs and I called FBI
headquarters to tell them what had just happened.  And the supervisor from headquarters says, AWell,
you have to understand where he=s coming from, Bob.@  I said, Ano, no, no, no.  I understand where I=m
coming from.  We both took the same damn
oath to defend this country against all enemies foreign and domestic and he
just said no?  No way in hell.@ 

 

Ross: (VO) Far from being reprimanded, the FBI
promoted the Muslim agent to one of its most important anti-terrorism posts, at
the American Embassy in Saudi Arabia, handling sensitive investigations for the
FBI in that Muslim country. 
[Broadcast Statement Four]

 








[While
Ross narrates, a stock video clip of a minaret is shown around sunset with the
muezzin=s
call to prayer playing in the background. 
This clip is followed by a video clip of the U.S. Embassy in Riyadh,
Saudi Arabia.]

 

Ross: (OC) The FBI says when it sent the Muslim agent
to Saudi Arabia, it was unaware of the allegations or of two other similar
incidents described to APrimetime@ by
FBI agents in New York and in Tampa.

 

Ross: (VO) In a statement to APrimetime,@ the
FBI also defends the agent as making significant contributions, saying he had a
right to refuse because the undercover recording was supposed to take place in
a mosque.  That=s a
complete lie, according to former prosecutor Flessner, who says a mosque was
never part of the plan and that the FBI is covering up.

 

[While
Ross narrates, a close-up of the official FBI statement is shown with the words
Ameeting
in a mosque@
highlighted.]

 

Flessner:     What he said was it was against his religion
to record another Muslim.  I was
dumbfounded by that response.

 

Ross: (VO) As to Wright, the FBI says the decision to
kill his case was appropriate at the time. 
Something Wright continued to protest to his supervisor through early
2001.

 

Wright:      You know what his response was?  AI think it=s
just better to let sleeping dogs lie.@  This is January of 2001.

 

Ross: (OC) January 2001?  Let sleeping dogs lie.

 

Wright:      Those dogs weren=t
sleeping, they were training, they were getting ready.

 








Ross: (VO) On September 11th, the two agents watched
in horror worried that men they could have stopped years earlier were
involved.  And now, the White House says
they were.  One month after the attacks,
the US government officially identified Yassin Al Kadi as one of Osama Bin Laden=s
important financiers, a specially designated global terrorist, the same man,
who years earlier, the FBI had ordered agents Vincent and Wright to leave
alone.

 

[At
the beginning of Ross=
narration here, a photograph of the Twin Towers in New York on September 11th,
with smoke from the first strike and the second plane on approach is
shown.  This is followed by a close-up of
a statement from the U.S. government about Yassin Kadi, and Kadi=s
photograph.]

 

Ross: (OC) No surprise to you? 

 

Wright:      No.

 

Vincent:     No, there=s no
surprise there.

 

Wright:      We knew. 
Yeah.

 

Ross: (VO) Kadi, a multimillionaire with ties to the
Saudi Royal Family, tells ABC News he can prove his total [i]nnocence,
repeatedly denying from his office in Riyadh, any connection to Osama Bin Laden
or Al Qaeda.

 

[While
Ross narrates, a video clip of a Yassin Kadi interview is shown.]

 

Kadi:         Not even one cent went to Osama Bin
Laden.

 

Ross: (VO) But just this month Kadi was back in the
news, as agents, not FBI agents, but U.S. customs agents conducted a midnight
search of a Boston company believed to be secretly owned and controlled by
Kadi.  The company, it turns out, provides
computer software to the FBI and other Federal agencies, which means Kadi and
his employees could have had access to some of the government=s
most sensitive secrets.  In a vindication
of what FBI agent Wright has been saying all along, the Federal government now
says it is pursuing possible criminal charges against Yassin Kadi.

 

[While
Ross narrates, a video clip of what appears to be U.S. customs agents carrying
out computer components is played.]

 

Wright:      And there=s,
there=s so
much more.  God, there=s so
much more.








Sawyer:     (OC) The Bush
Administration could hear from the agents yet. 
They say they=re ready, if
called, to testify before the newly appointed independent commission
investigating why no one stopped the 9/11 terrorists in time.

Article

Ross and Vic Walter
co-authored the Article, entitled, ACalled Off the Trail?  FBI
Agents Probing Terror Links Say They Were Told, >Let Sleeping Dogs Lie.=@  The blurb beneath the byline
with the authors= names
states, ADec. 19CTwo veteran
FBI investigators say they were ordered to stop investigations into a suspected
terror cell linked to Osama bin Laden=s al Qaeda network and the Sept. 11 attacks.@  The text of the Article
follows; the Challenged Statements are bolded.

In a
dramatic interview with ABCNEWS, FBI special agents and partners Robert Wright
and John Vincent say they were called off criminal investigations of suspected
terrorists tied to the deadly bombings of two U.S. embassies in Africa.  U.S. officials say al Qaeda was responsible
for the embassy attacks and the Sept. 11, 2001, attacks in the United
States.  

 

ASeptember
the 11th is a direct result of the incompetence of the FBI=s
International Terrorism Unit.  No doubt
about that.  Absolutely no doubt about
that,@
Wright said.  AYou
can=t
know the things I know and not go public.@

 

In
the mid-1990s, with growing terrorism in the Middle East, the two Chicago-based
agents were assigned to track a connection to Chicago, a suspected terrorist
cell that would later lead them to a link with Osama bin Laden.  Wright says that when he pressed for
authorization to open a criminal investigation into the money trail, his
supervisor stopped him.








 

ADo
you know what his response was?  >I
think it=s
just better to let sleeping dogs lie,=@ said Wright.  AThose dogs weren=t
sleeping.  They were training.  They were getting ready.@  The FBI says its handling of the matter was
appropriate at the time.

ATruthfully,
if 9/11 had not occurred we wouldn=t be here [giving the
interview],@ said
Vincent, a 27-year veteran at the bureau until he retired a few days after
being interviewed by ABCNEWS.  ABecause
of 9/11, we=re
here because we see the danger.@

 

>You
Will Not Open Criminal Investigations=

 

The
suspected terrorist cell in Chicago was the basis of the investigation, yet
Wright, who remains with the FBI, says he soon discovered that all the FBI
intelligence division wanted him to do was to follow suspected terrorists and
file reportsCbut
make no arrests.

 

AThe
supervisor who was there from headquarters was right straight across from me
and started yelling at me, >You will not open criminal
investigations.  I forbid any of
you.  You will not open criminal
investigations against any of these intelligence suspects,=@
Wright said.

 

Even
though they were on a terrorism task force and said they had proof of criminal
activity, Wright said he was told not to pursue the matter.

 

In
1998 al Qaeda terrorists bombed two American embassies in Africa.  The agents say some of the money for the
attacks led back to the people they had been tracking in Chicago and to a
powerful Saudi Arabian businessman, Yassin al-Kadi.  Al-Kadi is one of 12 Saudi businessmen
suspected of funneling millions of dollars to al Qaeda and who had extensive
business and financial ties in Chicago.

 

Yet,
even after the bombings, Wright said FBI headquarters wanted no arrests.

 








ATwo
months after the embassies are hit in Africa, they wanted to shut down the
criminal investigations,@ said
Wright.  AThey
wanted to kill it.@

 

The
move outraged Chicago federal prosecutor Mark Flessner, who was assigned to the
case despite efforts Wright and Vincent say were made by superiors to block the
probe.  Flessner said Wright and Vincent
were helping him build a strong criminal case against al-Kadi and others.

 

AThere
were powers bigger than I was in the Justice Department and within the FBI that
simply were not going to let it [the building of a criminal case] happen.  And it didn=t
happen,@
Flessner said.

 

He
said he still couldn=t
figure out why Washington stopped the caseCwhether it was Saudi
influence or bureaucratic ineptitude. 

 

AI
think there were very serious mistakes made,@ said Flessner.  AAnd I think, it perhaps,
cost, it cost people their lives, ultimately.@

 

Muslim
Agent Refused to Record Fellow Muslim, Agent Says.

 

Perhaps
most astounding of the many mistakes, according to Flessner and an affidavit
filed by Wright, is how an FBI agent named Gamal Abdel-Hafiz seriously
damaged the investigation. [Article Statement One]  Wright says Abdel-Hafiz, who is Muslim,
refused to secretly record one of al-Kadi=s
suspected associates, who was also Muslim. 
Wright says Abdel-Hafiz told him, Vincent, and other agents that Aa
Muslim doesn=t
record another Muslim.@ [Article Statement
Two/Article Statement Three]

 

AHe
wouldn=t
have any problems interviewing or recording somebody who wasn=t a
Muslim, but he could never record another Muslim,@ said
Vincent. 

 








Wright
said he Awas
floored@ by
Abdel-Hafiz=s
refusal and immediately called the FBI headquarters.  Their reaction surprised him even more:  AThe supervisor from
headquarters says, >Well,
you have to understand where he=s coming from, Bob.=  I said, >no, no, no, no, no.  I understand where I=m
coming from,[>]@ said
Wright.  AWe
both took the same damn oath to defend this country against all enemies foreign
and domestic and he just said no?  No way
in hell.@ 

 

Far
from being reprimanded, Abdel-Hafiz was promoted to one of the FBI=s
most important anti‑terrorism posts, the American Embassy in Saudi
Arabia, to handle investigations for the FBI in that Muslim country.

 

The
FBI said it was unaware of the allegations against the Muslim agent when he was
sent to Saudi Arabia or of two similar incidents described to ABCNEWS by agents
in New York and Tampa, Fla.  They said
Abdel-Hafiz contributed significantly to many successful terror investigations.

 

In a
statement to ABCNEWS, the FBI also defended the agent, saying he had a right to
refuse because the undercover recording was supposed to take place in a mosque.

 

But
former prosecutor Flessner said that was a lie and the mosque was never part of
the plan.

 

AWhat
he [Abdel-Hafiz] said was, it was against his religion to record another
Muslim.  I was dumbfounded by that
response,@ said
Flessner.  AAnd I
had perfectly appropriate conversations with the supervisors of his home office
and nothing came of it.@

 

Closing
In on Bin Laden Money Trail.

 

On
Sept. 11, 2001, the two agents watched the terror attacks in horror, worried
that men they could have stopped years earlier may have been involved.

 

The
White House confirmed their fears.  One
month after the attacks, the U.S. government officially identified al-KadiCthe
same man the FBI had ordered Wright and Vincent to leave alone years earlierCas
one of bin Laden=s
important financiers.

 








Al-Kadi
told ABCNEWS he can prove his total innocence, repeatedly denying, from his
office in Riyadh, any connection to Osama bin Laden or al Qaeda.

 

ANot
even one cent went to Osama bin Laden,@ he said.

 

But
on Dec. 6, U.S. Customs agents, as part of their own investigation, conducted a
midnight search of a Boston-area company believed to be secretly owned and
controlled by al-Kadi.

 

The
company provides computer software to the FBI and other key federal agencies,
which means al-Kadi and his employees could have had access to some of the
government=s
most sensitive secrets.

 

Al-Kadi
is on the U.S. government=s Adirty
dozen@ list
of leading terror financiers being investigated by the CIA.  The federal government says it is pursuing
possible criminal charges.

 

AI was
relieved that Customs was picking it up . . . where we failed big
time,@ said
Wright.  AThere=s so
much more.  God, there=s so
much more.  A lot more.@ 

 

We will discuss the pertinent portions of the
November Article below, rather than set it out in its entirety here.

Appellant=s Claims








Appellant makes the following
contentions with regard to ABC=s Broadcast and Article: (1) that ABC made and published statements
that it knew were substantially false, that is, published the statements with
actual malice; and (2) that ABC chose its material with actual malice and
omitted material facts and juxtaposed facts in a material way such that the
gist of the Broadcast and the Article was false.[16]

(1) Challenged Statements








As we have already overruled
Appellant=s seventh
issue, pertaining to Wright and Vincent=s special appearances, we do not address the truth or falsity of their
statements within the Broadcast and the Article or whether they made those
statements with actual malice.  See
Tex. R. App. P. 47.1.  Instead, we review whether there is evidence
in the record to show that, between the taping of Wright and Vincent=s interview on December 9, 2002 and ABC=s publication of the Broadcast and the Article on December 19, 2002,
ABC either knew that Wright and Vincent=s statements, including part of Broadcast Statement Two and Broadcast
Statement Three, and all of the Article statements were false or that ABC had
serious doubts about whether those statements were true.  We will review the remaining statements,
Broadcast Statement One, part of Broadcast Statement Two, and Broadcast
Statement Four, which were directly attributed to ABC and its employees, under
the same actual malice standard.

Appellant contends that there
is substantial evidence that ABC Aknew that Appellant was not ordered to engage in the recording, knew
that Appellees Wright and Vincent could not order Appellant to engage in the
recording, or knew that Appellant was not accused of disobeying an order to
engage in the recording when [ABC] had no information to support its
statements.@  Appellant specifically asserts that the
Challenged Statement made by Gibson, Broadcast Statement One, was made with
actual malice.

With regard to evidence that
ABC knew the Challenged Statements were false or had serious doubts with regard
to their truth, we look to the evidence in the record pertaining to the state
of mind of ABC=s reporters,
researchers, and related staff at the time that the Broadcast and Article were
published.[17]  Gibson=s Statement And ABC=s Knowledge Pertaining To AOrders@








The portion of Broadcast
Statement One at issue is Gibson=s phrase, AA Muslim FBI
agent accused of refusing orders to secretly record another Muslim
suspected of terrorist connections.@  [Emphasis added.]  Appellant calls Broadcast Statement One Athe most striking false statement@ because A[t]here is
no question . . . that an order as to whether or not Appellant
was to engage in consensual monitoring could only have come from Dallas SAC
[Danny] Defenbaugh.@  [Emphasis added.]








Gibson states in his
affidavit that on December 19, 2002, he was an anchor on ABC=s Primetime Thursday program, that he did not have any
involvement in the research or preparation of the Broadcast script or the
Article, and that at the time of publication, he believed all of the statements
contained in the Broadcast and Article to be true and did not entertain any
doubts about their truth.  There is no
evidence in the record that Gibson did any of the research or preparation for
the portion of the Broadcast pertaining to Wright, Vincent and the FBI.[18]  To the contrary, however, Ross, a journalist
with thirty‑five years of experience, stated in his affidavit that he and
Vic Walter were responsible for both the Broadcast and the Article.  Nothing in the record indicates that Gibson
did anything more than read Broadcast Statement One aloud.  Therefore, unless there is any evidence in
the record to show that either Ross or Walter believed Broadcast Statement One
was false or had serious doubts about its truth and that one of them conveyed
this information to Gibson, there is no genuine issue of material fact with
regard to Gibson and actual malice.

Ross and Walter stated in
their affidavits that, at the time the Broadcast and the Article were
published, they believed all of the statements within were true and that they
did not entertain any doubt, serious or otherwise, about their truth.  Ross detailed the process by which he and
Walter conducted their research and preparation for the Broadcast and Article.[19]  Ross stated that they interviewed Flessner,
Wright, Carmody, and Vincent, as well as a former FBI agent, Jack Cloonan.  The Flessner, Wright, Carmody, and Vincent
interviews were all videotaped and the transcripts are included in the record.








Ross stated that they
attempted to interview Appellant, contacting him at the embassy in Saudi Arabia
in early December 2002.  The e‑mail
from Richen to Appellant, requesting an interview for Primetime Thursday,
is included in the record.[20]  Ross further stated that ABC was informed
that Appellant was not willing to give an on‑camera interview to ABC and
would not provide them with a written or oral comment, that they interviewed
other FBI representatives for background Aoff the record,@ and that
the FBI provided ABC with an official statement.[21]  The FBI=s official statement is also included in the record, as is Rackmill=s letter informing the FBI about Wright, Vincent, Flessner, and
Carmody=s allegations about Appellant and requesting a response.








Ross stated that he and
Walter Areviewed a number of documents@ in their preparation for the Broadcast and the Article, and that
these documents included, but were not limited to, the following: (a) Wright=s affidavit filed in support of Operation Vulgar Betrayal=s civil forfeiture application;[22]
(b) Wright=s sworn EEOC
statement responding to Appellant=s discrimination complaint; and (c) Wright=s performance evaluation during the time that Appellant allegedly made
his refusal to record a terrorism suspect. 
All of these documents are included in the record.  Ross testified that he considered Cloonan,
Flessner, Wright, Vincent, and Carmody to be credible.








Ross stated that he was aware
that the allegations made about Appellant by Wright, Vincent, and Carmody had
been made public at a nationally televised press conference several months
after September 11, 2001, that Wright had appeared on CNN Crossfire, and
that there was additional news reporting about the allegations in a November
2002 article in the Wall Street Journal. 
A transcript of the CNN Crossfire interview and a copy of the
November 2002 Wall Street Journal article are included in the record,[23]
as is the transcript of Wright=s May 2002 press conference.








Appellant argues that Wright,
Vincent, and Flessner did not actually state that Appellant refused an Aorder@ and that
Defenbaugh and Timothy Gossfeld were clear that the decision was not Appellant=s to make.  Gossfeld was Wright=s former supervisor in the Chicago FBI office.  Defenbaugh was the special agent in charge of
the Dallas FBI office in 1999.  Appellant
cites ABC=s interview
with Defenbaugh and the FBI press statement issued to ABC prior to publication
to indicate that ABC was aware that the consensual monitoring decision and
Appellant=s role were
determined by the Dallas FBI management. However, ABC=s interview with Defenbaugh is not contained within the record and Defenbaugh
testified only that he recalled a conversation with Apossibly somebody from the media@ and that he would never have said that it was Appellant=s decision not to perform consensual monitoring.  Ross testified that he did not know what the
duties of a special agent in charge entailed, that Walter interviewed
Defenbaugh, and that Walter might have reported to him what Defenbaugh
said.  However, the record does not
indicate what, if anything, Walter reported to Ross.

In his response to ABC=s motion, Appellant stated that Walter testified that he did not
believe Wright or Vincent had authority to order Appellant to do anything; in
his appellate brief, Appellant argues that Walter gave contradictory testimony
about who could give orders to Appellant. 
However, the trial court sustained ABC=s evidentiary objections pertaining to the portions of Walter=s deposition relied upon by Appellant, and Appellant does not appeal
these evidentiary rulings.








Walter, an ABC producer who
had worked with Ross for over twenty years, stated in his affidavit that he had
interviewed or participated in the interviewing of Wright, Vincent, Carmody,
and Flessner and had found all of them to be credible.  Walter testified that he contacted Defenbaugh
a couple of days prior to the Broadcast. 
In response to the question, ASo the answer is you don=t know whose orders [Appellant] was supposed to follow?@  Walter replied, AI know that we were told, I was told, that [Appellant] was told that
he was required to participate in the investigation and he refused,@ and that it was Walter=s understanding that being required was the same as being
ordered.  He testified that he was not
saying that Wright or Vincent could require another agent to wear a wire, but
that he thought, A[W]hen you
are required or expected to wear the wire . . . and you refuse[,]
that surmounts to refusal to follow an order.@  He explained that by Asurmounts to refusal,@ he meant the equivalent of not following an order.

Therefore, although
Defenbaugh testified that the special agent in charge of the field office to
which a particular agent was assigned would have to approve a consensual
monitoring request to use that agent, and that, in Appellant=s case, he would have been the special agent responsible for such
authorization, there is no evidence in the record that he actually conveyed
this information to ABC.  Although
Gossfeld testified that the Chicago FBI office=s initiative to have Appellant perform consensual monitoring was a Arequest[;] [i]t was not a command or a directive or an order,@ that the request would go to the Dallas FBI office, and that the
Dallas office=s management
would make the decision, he also testified that no one from ABC or other media
contacted him about Wright and Vincent=s allegations.

The FBI=s official statement is also vague with regard to the actual decision-making
party or parties.  The third paragraph
addresses the Aalleged
refusal to wear a recording device,@ stating:








[Appellant] while assisting
in an international terrorism investigation, was requested to meet with a
subject of the investigation.  Based upon
his knowledge of the subject=s background and the case, as well as the location of the meeting in a
mosque, [Appellant] recommended against, while suggesting an alternative
plan.  Ultimately, the decision was
made by management of the Dallas office and Chicago agreed to abide by that
decision.  The Dallas Special Agent
in Charge and other supervisors concurred with [Appellant=s] request not to conduct the consensual monitoring.  [Appellant] proposed to meet
with the individual and testify in court to contents of the meeting, but the
Chicago Division decided not to exercise that option.  The [Special Agent in Charge] advised that
had the consensual monitoring been requested for any location other than a
mosque, [Appellant] would have supported the proposal.  In addition, the Attorney General Guidelines
regarding consensual monitoring forbid such investigative activity in a mosque
or other place of worship in these circumstances.  [Emphasis added.] 

Appellant testified that the FBI=s statement was inaccurate with regard to its assertion that the
consensual monitoring was supposed to occur in a mosque.








While the FBI statement does
indicate that the final decision was made by the Dallas FBI office, the
language used with regard to Appellant, that he Arequest[ed] not to conduct the consensual monitoring,@ that the Dallas FBI office Aconcurred with [his] request,@ and that he Awould have
supported the proposal,@ indicates
that Appellant had significant input into that final decision, even if he did
not receive an order.  The FBI statement
does not mention Aorders@ at all.  Michael Resnick, a
supervisory special agent with FBI headquarters, testified that, theoretically,
anyone in Appellant=s chain of command
had the authority to order Appellant to surreptitiously record another person,
but that Wright and Flessner would not have had such authority.  There is no evidence in the record that
Resnick conveyed this information to ABC. 

Although Appellant asserts that Wright, Vincent, and Flessner did not
actually state that Appellant refused an Aorder,@ and
the record reflects that they did not mention Aorders@ at
all during their interviews, Ross stated in his affidavit that: 

 

We
were told that [Appellant=s]
refusal to secretly record Muslim suspects was an act of insubordination and
that his refusal based on religious reasons was Anot
an agent=s
option@ that
an FBI agent Adoesn=t
have that choice@ and
that Ait=s not
permitted.@  We were told that [Appellant=s]
refusal was unprecedented in the considerable experience of agents Wright,
Carmody, Vincent, and the lead prosecutor, Assistant U.S. Attorney Flessner. 























We have reviewed the ABC interviews with Wright,[24]
Carmody,[25]
Vincent,[26]
and Flessner,[27]
as well as the supporting documentation that Ross referenced;[28]
all of these assertions are supported in the record.  Combined with Walter=s testimony, that he interpreted as being expected to wear a wire as
the equivalent of an order, the record indicates that Ross and Walter believed
when Broadcast Statement One was published that Appellant had refused an order,
even if they were mistaken.  There is
nothing in the record to show that either Ross and Walter doubted the truth of
Broadcast Statement One or that either one informed Gibson of such doubt.








To prove malice, the
plaintiff must offer proof of the defendant=s state of mind at the time of publication.  See Skeen, 159 S.W.3d at 637; New
Times, Inc., 146 S.W.3d at 162; see also Foster v. Upchurch, 624
S.W.2d 564, 566 (Tex. 1981) (AIt is not enough for a plaintiff to show that the defendant made a
mistake.@); Gonzales v. Hearst Corp., 930 S.W.2d 275, 277 (Tex. App.CHouston [14th Dist.] 1996, no writ) (stating that showing defendant
made a mistake or erred in judgment is not enough to prove actual malice
without also showing defendant=s state of mind).  The plaintiff
must present some evidence that the defendant purposefully published mistaken
facts or that the circumstances were Aso improbable that only a reckless publisher would have made the
mistake.@  Freedom Newspapers of Tex.
v. Cantu, 168 S.W.3d 847, 855 (Tex. 2005). 
Evidence that a report was mistaken, even negligently so, is not
evidence of actual malice.  Id.; Turner,
38 S.W.3d at 120 (AA publisher=s presentation of facts may be misleading, even negligently so, but is
not a >calculated falsehood= unless the publisher knows or strongly suspects that it is
misleading.@).  Because a poor choice of words, without any
showing to indicate that the authors thought they were making a false statement
or at least had serious doubts about its truth, does not create a genuine issue
of material fact with regard to actual malice, we overrule this portion of Appellant=s first issue with regard to Broadcast Statement One.  See Cantu, 168 S.W.3d at 855;
Forbes Inc. v. Granada Biosciences, Inc., 124 S.W.3d 167, 174 (Tex. 2003).








Wright=s
Remaining Statements (Part of Broadcast Statement Two, Broadcast
Statement Three, and Article Statements One through Three) 

 

Having reviewed Ross and
Walter=s affidavits and depositions, as well as all of the interviews and
documents referenced by Ross in his affidavit, we likewise conclude that there
is no evidence in the record to show that Ross and Walter, as ABC=s representatives, did not believe that Wright was telling the truth
or had serious doubts about whether Wright was telling the truth when Wright
made the challenged statements attributed to him in the Broadcast and the
Article.  See Skeen, 159 S.W.3d at
637.  Therefore, we overrule this portion
of Appellant=s first
issue as it pertains to Wright=s remaining statements.

Ross=
Statements (Part of Broadcast Statement Two, Broadcast
Statement Four)

 

With regard to Broadcast
Statement Two, Flessner told Ross that, concerning the 1999 Kadi investigation
and the consensual monitoring issue, AIt was a key link.  It was a
. . . huge break in the investigation.  But ultimately it didn=t pan out to anything because of the . . . agent=s refusal to cooperate.@ Wright stated in his EEOC statement that Appellant stated that he Awould only record the individual if he told him he was wearing a wire.@  Wright described the
relationship between Yassin Kadi and the company the suspect worked for in his
1998 civil asset forfeiture affidavit.








With regard to Broadcast
Statement Four, when asked what he expected to happen to the Muslim agent after
the refusal, Flessner informed Ross that A[he] assumed he would have been . . . sanctioned in some
way,@ but, instead, found out that nothing happened.  Vincent told Ross during his interview that
Appellant=s alleged
refusal was Aunheard of.@  Wright told Ross that he Awas floored@ by
Appellant=s response
and anticipated that Appellant would be fired, saying that he thought, after
the alleged refusal, that A[t]here is no way in hell that [Appellant would] remain as an FBI
agent after what [he] just did.@  In his ABC interview, Carmody
expressed his consternation that Appellant had, instead, attained an FBI
position at the U.S. Embassy in Saudi Arabia.

There is no evidence in the
record to indicate that Ross disbelieved Wright, Flessner, or Carmody, or that
he had serious doubts about the truth of Broadcast Statements Two and Four when
he made them.  See Skeen, 159
S.W.3d at 637.  Therefore, we overrule
Appellant=s first
issue as it pertains to Broadcast Statements Two and Four. 

November Article








Appellant challenged two
phrases from ABC=s November
Article, listing them as A. . .
allegations that a Muslim FBI agent may have thwarted the investigation two
years before September 11, 2001,@ and AGamal Abdel‑Hafiz,
a Muslim FBI Agent, refused to cooperate with an FBI probe into BMI,
Inc., . . . .@  The full statements, with the
challenged portions in bold, are:

An
FBI affidavit, obtained by ABCNEWS, contains details of the aborted
investigation of al-Kadi, including his ownership of a suspicious chemical
plant in suburban Chicago and allegations that a Muslim FBI agent may have
thwarted the investigation two years before the [sic] Sept. 11, 2001.

 

According
to the Wall Street Journal today, in an affidavit dated March 21, 2000,
an FBI agent from the organization=s Chicago counterterrorism
squad alleged that Gamal Abdel-Hafiz, a Muslim FBI Agent, refused to
cooperate with an FBI probe into BMI Inc., a now defunct Secaucus, N.J.,
company currently under U.S. investigation in the probe of al-Kadi.

 

Wright=s 1998 civil asset forfeiture affidavit and his EEOC statement contain
the information in the first statement. 
The November 26, 2002 Wall Street Journal article contained the
following information:

Robert
Wright of the FBI=s
Chicago counterterrorism squad responded [to Appellant=s
internal complaint] with an 11-page affidavit dated March 21, 2000, that
. . . alleged that [Appellant] refused to cooperate with an FBI probe
into BMI Inc., a now-defunct Secaucus, N.J., company that figures in government
investigations of Yassin Qadi, a Saudi businessman whom the U.S. government
says is a supporter of terrorism.

 








Appellant
testified at the special appearance hearing that he had chosen not to sue the Wall
Street Journal Abecause
. . . they attributed everything to somebody.@[29]

 

Ross stated that he helped
write the November Article, that it reported, in part, on the allegations in
the Wall Street Journal article of the same date, November 26, 2002, and
that at the time of publication, he believed all of the

statements in the November Article to be true and
entertained no doubts about their truth. 
There is no evidence in the record to show that ABC published these
statements with actual malice.  As
discussed above, there is no evidence in the record to show that ABC knew, with
regard to Wright=s affidavits
or with regard to the Wall Street Journal article, that the information
was false or that it had serious doubts about the information at the time of
publication.  See Skeen, 159
S.W.3d at 637.  We overrule this portion
of Appellant=s first
issue. 

(2) Choice Of Material And Juxtaposition

Appellant argues that ABC
chose its material with actual malice and that the omission of material facts
and the juxtaposition of facts in a material way rendered the gist of the
Broadcast and Article false.








Appellant=s assertions with regard to the omission and juxtaposition of
information in the Broadcast are more akin to editorial choices than deliberate
defamation.  See Huckabee,
19 S.W.3d at 425‑26 (holding that a media defendant=s Aomission of
facts may be actionable if it so distorts the [viewers=] perception that they receive a substantially false impression of the
event@); see also Turner, 38 S.W.3d at 116 (ALike a statement of opinion, a publication may by omission or
misleading juxtaposition connote false facts even though it does not state them
directly.@)

For a public figure to
demonstrate that a defendant=s editorial choices constitute actual malice, he must present evidence
that the defendant was aware that these choices could create a substantially
false impression.  See Huckabee,
19 S.W.3d at 426 (stating that the plaintiff could satisfy this test with
evidence that defendant selectively omitted facts to purposefully create false
portrayal of events).  If the omission of
certain facts does not grossly distort the story, then the defendant=s Afailure to
capture accurately all the story=s details suggests [only] an error in judgment, which is no evidence
of actual malice.@  Id. 
Additionally, evidence that a broadcast was created Afrom a particular point of view, even when [it is] hard‑hitting
or sensationalistic, is no evidence of actual malice.@  See id. at 425.








There is no doubt that ABC=s Broadcast was sensationalisticCfilled with language like Aexplosive allegations,@ Aastounding,@ Aa complete
lie.@  However, the question here is:
is there any evidence that ABC decided to omit portions of the FBI press
statement and to arrange the portions of the interviews, photos, and videos it
used with actual malice, that is, with awareness the omitted or juxtaposed
materials could create a substantially false impression of Appellant?  See id. at 426.  We have already discussed the research and
development conducted by ABC with regard to the Broadcast and the Article and
concluded that there was no evidence that ABC published the contested
statements with actual malice.  We now
consider that evidence in light of the arrangement and selection of the
information contained within the Broadcast. 








The Broadcast=s theme was Aa story the
FBI did not want told,@ presented
by Atwo agents step[ping] out of the shadows to tell what they know,@ about FBI problems investigating terrorism pre-9/11.  The report chronicled Wright and Vincent=s investigation in the mid-1990s with regard to a terrorist cell in
Chicago; the connection between that cell, Yassin Kadi, and the American
Embassy bombings by al-Qaeda in Africa in 1998; how Appellant=s alleged refusal to tape Aone of Kadi=s suspected
associates@ affected
that investigation; how FBI headquarters, through apathy or for other reasons,
prevented Wright and Vincent from continuing their investigation; and Wright
and Vincent=s responses
to 9/11 and its connection to Kadi.  The
report also included Kadi=s response
to allegations that he was connected to Osama bin Laden or al-Qaeda.

Appellant contends that ABC=s decision

to
juxtapose the allegations involving Appellant between Mr. Flessner=s
statements regarding mistakes possibly costing lives, and a photo and voice
over regarding the World Trade Center attack creates a deliberately false
impression in light of Mr. Flessner=s statements that he could
not say that the Chicago investigation would have impacted the September 11,
2001 terrorist attacks. 

 

He also argues that ABC Aliterally placed the allegations about Appellant >side by side= with the
video image and voice over regarding the September 11th terrorist attacks,@ such that the Ainevitable
conclusion that one draws from the Broadcast is that Appellant=s alleged conduct led to the September 11th terrorist attacks.@








However, it is clear in the
chronology of the Broadcast that Flessner=s statement refers to the 1998 embassy bombings discussed immediately
before his comment.  Ross states in that
segment of the story that the bombings killed more than two hundred people.  While the next segment of the story does
pertain to Appellant, it begins with the allegations by Flessner and Wright
about Appellant=s
involvement in Athe
investigation.@  The first segment of the story introduces
Wright and Vincent=s
assignment, to Atrack a
connection to Chicago, a suspected terrorist cell that would later lead them to
an Osama bin Laden connection.@  The connection referred to is
Kadi, first named in the embassy bombing segment, and the Adamage@ referred
to, with regard to Appellant and the story, is that Appellant A[told] Wright and Vincent he would refuse to secretly record one of
Kadi=s suspected associates who was also a Muslim.@  9/11, and the photo of the
second plane approaching the already-smoking Twin Towers, is not mentioned
until the final segment, with regard the FBI=s Adecision to
kill [Wright=s] case.@

While there is a connection
to Appellant in that he is mentioned in the same broadcast as Kadi, who was
linked to 9/11 and al-Qaeda in the Broadcast, the overarching theme is of FBI
incompetence, rather than Appellant=s actions or inaction.  The
story segment immediately before the photo of the Twin Towers addresses Wright=s supervisor=s response
to his protest of the FBI decision to Akill his case.@  The supervisor=s response, in January 2001, was AI think it=s just
better to let sleeping dogs lie.@  Wright then states, to the
camera, A[t]hose dogs weren=t sleeping.  They were training,
they were getting ready.@  The next scene is of the Twin Towers, with
Ross= voice over about September 11, and how, one month later, the U.S.
government Aofficially
identified Yassin Kadi as one of Osama bin Laden=s important financiers, a specially designated global terrorist.@








A party cannot avoid summary
judgment by relying on circumstantial evidence that is equally consistent with
the nonexistence of the fact the party seeks to prove.  Soodeen v. Rychel, 802 S.W.2d 361, 363
(Tex. App.CHouston [1st
Dist.] 1990, writ denied); see also Hammerly Oaks, Inc. v. Edwards, 958
S.W.2d 387, 392 (Tex. 1997) (holding Ameager circumstantial evidence@ that could give rise to any number of inferences, none more probable
than another, is no evidence of an ultimate fact issue).  In light of Wright and Vincent=s statements during the interview and all of the materials reviewed by
Ross and Walter prior to publication, and bearing in mind that a publisher=s presentation of facts may be misleading but still not constitute a Acalculated falsehood@ unless the publisher knows or strongly suspects that it is
misleading, and considering the totality of the story presented by ABC in its
Broadcast, there is no evidence in the record to support Appellant=s contention that ABC deliberately omitted or juxtaposed the
information in the Broadcast in order to present a substantially false
impression of Appellant.  See Turner,
38 S.W.3d at 120; Huckabee, 19 S.W.3d at 426.  Therefore, we overrule the remainder of
Appellant=s first
issues.[30]

 








CONCLUSION

Because we have overruled all
of Appellant=s issues, we
affirm the judgment of the trial court.

 

DIXON W. HOLMAN

JUSTICE

 

PANEL
A:  CAYCE, C.J.; HOLMAN and GARDNER, JJ.

 

DELIVERED:  November 15, 2007











[1]We refer to ABC, Inc., ABC News,
Inc., ABC News Holding Company, Inc., Charles Gibson, and Brian Ross as AABC@ except where otherwise noted.





[2]In his first amended petition and
in his supplemental petition, Appellant challenged additional statements.  However, the statements quoted in this
opinion are the only statements that Appellant has challenged on appeal.  In his appellate brief, Appellant attempted
to add additional statements not contained within his first amended petition
and supplemental petition, but we will not consider these new statements
because they were not brought before the trial court.  See Tex.
R. App. P. 33.1.





[3]Appellant treats these as separate
statements in his appellate brief, but he set them out in his supplemental
petition as one statement.





[4]Article Statement Three merely
duplicates a portion of Article Statement Two. 
Therefore, we will not address it separately.





[5]We refer to this last claim as
Appellant=s Ajuxtaposition claim.@ 
See Turner v. KTRK Television, Inc., 38 S.W.3d 103, 115 (Tex.
2000) (holding that a plaintiff can bring a claim for defamation when discrete
facts, literally or substantially true, are published in such a way that they
create a substantially false and defamatory impression by omitting material
facts or juxtaposing facts in a misleading way).





[6]The underlying facts of this case
are substantially the same as another lawsuit filed in the 96th
District Court of Tarrant County, Texas, in that they both involve defamation
suits brought by Appellant against media entities.  See Fox v. Abdel-Hafiz, No.
02-06-00353-CV (Tex. App.CFort Worth Nov. 15, 2007, no pet.
h.).  The parties in both suits made a
rule 11 agreement providing that depositions from either case could be used in
both cases.  See Tex. R. Civ. P. 11.





[7]At the Judicial Watch press conference
in May 2002, Wright made public his redacted EEOC statement which makes
reference to a AMuslim FBI agent.@ 
(The EEOC statement will be discussed later in this opinion.)  The Wall Street Journal article,
entitled, AMuslim FBI Agent is Accused of Not
Taping Terror Suspects,@ was published on November 26,
2002.





[8]Appellant=s testimony at the special
appearance hearing addressed only the ABC Broadcast.  Nothing in the record contradicts the
assertions made by Wright and Vincent in their affidavits with regard to the
other publications.  See Tex. R. Civ. P. 120a(3).





[9]Wright and Vincent had objected
that Appellant=s affidavit was not based on
personal knowledge and failed to set forth specific facts that would be
admissible as evidence under rule 120a(3). 
See Tex. R. Civ. P. 120a(3).





[10]In his affidavit, Wright averred
that he had been a continuous resident of Indiana since 1993, that he had had
no purposeful connection with Texas other than incidental travel in 1998
through his employment as an FBI agent, that the ABC interview, conducted in
Illinois, had no connection with or focus on Texas, and that he did not divulge
Appellant=s identity during the
interview.  Wright stated that the
interview was not directed at a Texas audience as apart from an audience of any
other state, that it was his understanding at the time of the interview that
Appellant was assigned to and residing in Saudia Arabia, that he did not know
the exact religious make‑up of all agents in the FBI or have the means to
acquire knowledge of the number of AMuslim@ agents in the FBI, and that he did not travel to Texas in
2003.  Wright also stated that the
interview included no reference to the state of Texas.  However, while the interview did not contain
references to Texas, it did contain references to ADallas.@

Vincent made similar
averments in his affidavit and added that his trip to Dallas in March 2003 was
for a press conference on Aa matter wholly unrelated to [Appellant]@ and attached the event=s press release, entitled, AJUDICIAL WATCH REVEALS TERRORIST
FRONT GROUP CONTINUES TO OPERATE IN DALLAS/FORT WORTH, TX,@ to support this contention.





[11]Vincent also testified that he made
one trip to Texas in March 2003 for his employer, which Ahad nothing to do with [Appellant],@ supported by the press release
attached to his affidavit.  The press
conference occurred on March 5, 2003. 
Appellant testified that he returned to Texas from Saudi Arabia on March
14, 2003, and that he was ordered back because of an administrative inquiry by
the FBI.





[12]Although Appellant asserts, AWright acknowledged that Appellant
was in the Dallas FBI office when he allegedly made the statements to Appellee
Ross@ and that Wright Abelieved that Appellant was
stationed at the Dallas FBI office and that the communications with Appellant
were made through the Dallas FBI office,@ after reviewing the record, we conclude that Appellant=s first statement has no support in
the record and that the second statement pertains to the communication with
Appellant in 1999.

Wright testified that
his last contact with Appellant had been in May or June 1999 and that he Awould have no reason to know where
[Appellant] was after that.@  Appellant=s attorney asked, AThen you wouldn=t have any reason to think that he
had moved anywhere other than what you were told about him being in Riyadh by
. . . ABC and NBC news, is that correct?@ 
Wright replied, AI don=t even know how to answer, so I=m not gonna answer it,@ after his attorney objected to the
form of the question.





[13]Wright stated that the agent
contacted him, told him that the president of the company Wright was
investigating wanted to meet with the agent to talk about Wright=s investigation, and asked whether
Wright wanted the agent to meet with the company president.  Wright stated that he said yes, the agent
agreed, Wright told the U.S. attorneys about it, and then they found out that Athere was considerable resistance
on the part of the Muslim agent to wear a wire.@ 
He and Vincent talked about the agent=s alleged statement, that A[a] Muslim doesn=t record another Muslim,@ and about the fact that FBI
headquarters did not respond to their complaints about this.





[14]In his first amended and
supplemental petitions, Appellant claimed that he was a private
individual.  However, in his appellate
brief, Appellant merely argues that there is a genuine issue of material fact
as to the actual malice of ABC and does not dispute ABC=s contention that he is a public
figure.  Therefore, for purposes of our
review, we assume that Appellant was a public official, a public figure, or a
limited purpose public figure.  See
Tex. R. App. P. 38.1(f); W.
Steel Co. v. Altenburg, 206 S.W.3d 121, 124 (Tex. 2006) (AAn appellate court normally accepts
as true the facts stated in an appellate brief unless the opposing party
contradicts them.@).





[15]To recover for defamation, a public
figure suing a media defendant has the burden to prove that defamatory
statements made about him were false.  See
Bentley v. Bunton, 94 S.W.3d 561, 586 (Tex. 2002).  However, as we resolve Appellant=s claims here on the issue of
whether he raised a genuine issue of material fact as to actual malice, we need
not consider whether ABC=s Broadcast and Article either
expressly or implicitly made false statements about Appellant.  See Tex.
R. App. P. 47.1.  When, as here,
the trial court=s order granting summary judgment
does not specify the ground or grounds relied on for its ruling, summary
judgment will be affirmed on appeal if any of the theories presented to the
trial court and preserved for appellate review are meritorious.  Provident Life & Accident Ins. Co. v.
Knott, 128 S.W.3d 211, 216 (Tex. 2003); Star‑Telegram, Inc. v. Doe,
915 S.W.2d 471, 473 (Tex. 1995); Harwell v. State Farm Mut. Auto. Ins. Co.,
896 S.W.2d 170, 173 (Tex. 1995).





[16]In his first amended and
supplemental petitions, Appellant also contended that ABC acted with actual
malice by purposefully avoiding the truth. 
However, Appellant did not raise this issue in his appellate brief.  See Tex.
R. App. P. 38.1(e); Weaver v. Sw. Nat=l Bank, 813 S.W.2d 481, 482 (Tex. 1991)
(stating that an appellate brief must contain all issues relied upon).





[17]Specifically, although we review
the entire voluminous record with regard to a no evidence summary judgment, we
will only discuss the pertinent evidence, such as the affidavits of Ross,
Gibson, and Walter; the depositions of Ross and Walter; the email sent to
Appellant by Yoruba Richen, an ABC associate producer, requesting an interview
for Primetime Thursday; the letter sent by Jill Rackmill, another ABC
producer, to FBI=s Ed Cogswell prior to publication,
requesting an on-camera interview with FBI Director Robert Mueller about the
issues raised by Wright, Vincent, and Flessner in their interviews; the FBI
official statement sent to ABC; and transcripts of the ABC interviews with
Flessner, Carmody, Wright, and Vincent.





[18]Gibson also read the voice over for
a story on lighted billboards during the program=s introduction but the remainder of
the Broadcast that does not involve Wright, Vincent, or the FBI is not in the
record.





[19]Ross testified that his job duties
as chief investigative correspondent for ABC News were to develop and report
stories for Good Morning America, World News Tonight, Nightline,
Primetime, and 20/20, as well as ABC Radio and the abcnews.com
website.





[20]Appellant testified that he first
heard that ABC was going to do a story on him in the beginning of December 2002
because A[t]hey called the embassy and they
wanted to do an on camera interview with me.@  He testified that
the person who called was Richen, an ABC producer.  Appellant testified that he told the
ambassador, when asked about the situation, A[T]here=s an agent with the FBI who is accusing me of refusing to
wear recording and consensually monitoring a Muslim subject.@ 
He testified that he was unwilling to do an on camera interview because
he was a certified undercover agent and did not want his picture to be
broadcast.





[21]Ross also indicated that A[t]he FBI=s statement was false in several
respects, including the reason for [Appellant=s] refusal to record the Muslim
suspect,@ but he did not state the basis for
this opinion.  Appellant testified that
the statement contained an inaccuracy.





[22]Vulgar Betrayal=s mission was Ato identify and neutralize through
criminal process the HAMAS terrorist support organization located within the
United States.@ 
Wright=s June 1998 affidavit seeking civil
asset forfeiture described the relationship of Yassin Kadi, Kadi International,
and its related entity, BMI, Inc., of New Jersey, to terrorism suspects
involved in a money‑laundering scheme.





[23]The Wall Street Journal article
contains Wright=s and Carmody=s allegations and states that the
allegations were first made in 2000 Ain response to an internal discrimination complaint filed
against the FBI by the Muslim agent, Gamal Abdel‑Hafiz, then stationed in
Dallas.@ 
The article indicates that Wright=s affidavit in response to the internal complaint,
including the allegation that Appellant refused to wear a hidden microphone and
said that A[a] Muslim does not record another
Muslim,@ was released by the FBI under the
Freedom of Information Act.





[24]Wright, who had been with the FBI
for twelve years at the time of the interview, told Ross during his ABC
interview that a supervisor from FBI Headquarters had yelled at him, forbidding
him to open criminal investigations against intelligence subjects and that
Headquarters= policy was not to arrest
terrorists, but to watch them.  He did
not mention FBI hierarchy, other than to refer to supervisors, headquarters,
and the agency bureaucracy in general. 
He attempted to explain to Ross how the FBI was separated into two sidesCcriminal and intelligence.

He told Ross that a Muslim FBI
agent in Dallas contacted him, told him that the president from a company that
Wright was investigating wanted to meet with the Muslim agent to discuss Wright=s investigation, and asked Wright
if he should meet with him.  When the
Muslim agent was asked to wear a wire, he put forth Aconsiderable resistance,@ and said Aa Muslim doesn=t record another Muslim.@ 
Wright told Ross that Appellant=s response Afloored@ him and that he was convinced that Appellant would be
fired, describing his reaction to Ross as, A[t]here is no way in hell that you=re going to remain as an FBI agent
after what you just did.@ 
Wright told Ross that he called FBI Headquarters, and the Headquarters
supervisor said, AWell, you have to understand where
he=s coming from, Bob.@ 
Wright described his response, saying, AWe both took the same damn oath to
defend this country against all enemies foreign and domestic, and he just said
no?  No way in hell.@

Wright told Ross that
instead of being fired, Appellant filed a complaint against Wright for
questioning his loyalty to the United States. 
Wright told Ross that he told the EEOC counselor, A[I]f you think for two seconds I=m gonna apologize to this guy
because he=s refusing to do his job, no way in
hell is that going to happen.@  Wright told Ross
that he was glad that he had been investigated because he had a signed and
sworn statement that he could go public with under the Freedom of Information
Act.  Wright testified that he did not
tell ABC anything that was false.





[25]Carmody, a retired thirty‑four‑year
veteran special agent with the FBI, told ABC that Appellant refused to record a
conversation with a suspect that the Tampa FBI office and the Tampa U.S.
Attorney=s office wanted recorded, although
Appellant was willing to make the telephone call to the suspect, and that he
reported Appellant Ato the FBI [headquarters] and also
to [Appellant=s] superiors in Dallas, for his
refusal to cooperate in an official criminal investigation.@ 
Carmody told ABC that he Awas shocked that an agent would not do his duty@ and that Ait=s hard to conceive that the FBI
. . . would tolerate such behavior by an agent.@ 
Carmody asserted, A[A]n FBI agent has the duty to
enforce the law, and if he refuses to do so, he should not be an agent.@ Carmody also stated that, up until
then, AI=d never heard an agent refuse to do
his duty,@ and that he felt that Athat was insubordination, and it
should be reported to his superiors.@

Carmody did mention
that the Tampa U.S. Attorney=s office was aware that using Appellant Awould have to be coordinated with
the U.S. Attorney=s office in Dallas as well as the
FBI,@ that he reported Appellant=s refusal to Appellant=s Dallas superiors, and that
Carmody and the Tampa FBI office could not discipline Appellant, but there is
nothing in Carmody=s interview and affidavit to
explain to ABC the FBI hierarchy involved in giving Appellant an Aorder.@ 
Carmody stated in his affidavit that everything he communicated to ABC
in its December 2002 interview with him was true.





[26]Vincent, who had been with the FBI
for twenty-seven years, referred to the Aupper echelons of management@ at the FBI but did not specify who
was in charge of whom and also stated that Athere are a lot of holes in the FBI management that need to
be corrected.@ 
Vincent also said that FBI Headquarters could not admit to being wrong.

Vincent told Ross that,
with regard to Appellant, who was referred to in the interview as the Muslim
FBI agent, and wearing a wire, Appellant Asaid it was a cultural thing.  And on top of that, that a Muslim did not
record another Muslim.@ 
Vincent told Ross that this was Aunheard of. . . . [Y]ou do your job first.@ 
Vincent said that he inquired into how to file a dereliction of duty
complaint and that Headquarters never responded.  Vincent testified that he did not tell ABC
anything that was false.





[27]Flessner, who had been a federal
prosecutor in the Chicago office of the Department of Justice for twelve years,
told ABC during his interview that the FBI was there to assist the prosecutors
and that the FBI=s function is Ato investigate and prosecute
crimes.@ 
He said, with regard to the alleged refusal by Appellant to wear a wire,
Athe agent refused . . .
based on religious reasons . . . what he said was, it was against his
religion to record another Muslim.  I was
dumbfounded by that response.@  Flessner also told
ABC, Ait=s not an agent=s option to decide[] not to pursue
a criminal investigation . . . they don=t have that choice.  When they are told to assist in a criminal
investigation, that=s what they do.  It=s not . . . an organization that allows for
philosophical differences.@  Flessner did not
elaborate on who had the authority to tell an agent to assist in a criminal
investigation.  Flessner referred to Apowers@ bigger than he was in the Justice
Department and within the FBI but did not explain the management structure.

Flessner told ABC, A[I]n my experience in more than
twelve years I have never known an agent to say, I will not participate in this
investigation. . . . I think if you ask any agent on the street they
would say that that refusal is just unheard of. 
It=s not permitted.@ 
He told ABC that the opportunity to record the suspect was Aa huge break in the investigation[,]
[b]ut ultimately it didn=t pan out to anything because of
the agent=s refusal to cooperate.@ 
Flessner said that he had assumed that Appellant would have been
sanctioned in some way, but that he later found out nothing happened.  Flessner reiterated, A[A]n FBI agent=s job is not to decide not to
pursue an investigation . . . . [T]hat=s simply not their
job. . . . [T]heir responsibility is to investigate and prosecute
criminal offenses.@

Flessner testifed that he did not
say anything false in his interview.  He
also testified that the prosecutor Awould ultimately make the call as to how the investigation
was being directed in order to prove the case,@ that he was the lead prosecutor in
operation Vulgar Betrayal, and that Wright was the lead FBI investigator in
that operation.  He also testified that
the relationship between the prosecutor=s office and the FBI was not hierarchical and that he did Anot have a pure authority to order
anybody in the FBI to do anything,@ but that on every occasion that he could recall, when he
instructed FBI agents Ato conduct certain parts of certain
investigations to prove the case, and every case that was complied with that
I haveCto repeat myself, I have no memory
of ever having an FBI agent refuse a request to pursue an investigative lead.@ 
[Emphasis added.]

Flessner testified
that, in his entire experience with the Department of Justice, AI had never heard, nor was I ever
aware, nor did I experience with the exception of this case an agent refusing
to participate in an assignment or investigation for some religious or
philosophical reason.  It was just not an
option that was ever communicated to me in any way.@





[28]During the Judicial Watch press
conference covered by C-Span, Wright referred to incompetency and intentional
obstruction of justice by AFBI management.@  Part of Wright=s EEOC statement was read during
the press conference, including that the Dallas special agent stated what he
would and would not do, including that Ahe would only record the individual if he told him that he
was wearing a wire,@ that he feared for his safety,
that he did not trust the FBI to protect him, and that he stated, A[a] Muslim does not record another
Muslim.@ 
Carmody=s sworn declaration about his
incident with Appellant was also read during the press conference.

In Wright=s EEOC statement, Wright asserted
that after the teleconference with Appellant, he called FBI headquarters and
explained what had happened and that they Ahad both taken the same oath and this was [Appellant=s] duty.@ He also referred to a conversation
that he had with a special agent in another office about Athe problems I was having getting
[Appellant] to wear a wire.@

In the CNN Crossfire
interview, Wright stated that he stood by his statement and that his
concern was that Athis individual was working
international terrorism investigations and was refusing to do the sworn duty
that he swore he would do.@  In the Wall
Street Journal article, Wright alleged that Appellant Arefused to cooperate.@ 
Wright=s 1999 performance evaluation
reflects that he was assigned to international terrorism and that his
performance was Aexceptional.@ 
Wright=s June 1998 civil asset forfeiture
affidavit described the relationship of Yassin Kadi, Kadi International, and
BMI, Inc. to terrorism suspects involved in a money‑laundering scheme.





[29]The trial court granted ABC=s motion to file supplemental
summary judgment evidence in the form of portions of the testimony from the
special appearance hearing.  Appellant
testified at that hearing that he did not sue Carmody or the Wall Street
Journal.





[30]We do not reach Appellant=s remaining arguments.  See Tex.
R. App. P. 47.1.